1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RENARDO ROBERTSON, et al., | CASE NO. C19-1618 RSM |
| Plaintiffs, | ORDER ON PENDING MOTIONS |
| v. | |
| CATHOLIC COMMUNITY SERVICES OF WESTERN WASHINGTON, | |
| Defendant. | |

## I.     INTRODUCTION

This matter is before the Court on several pending motions.  Both Plaintiff and Defendant have filed motions to compel discovery.  Dkts. #57 and #59.  While those motions remained pending, Defendant filed a motion for summary judgment seeking to have the matter dismissed or to limit Plaintiff's damages.  Dkt. #69.  Upon responding to Defendant's motion for summary judgment, Plaintiff also filed a motion to withdraw and a motion to continue the date for the Court's consideration of Defendant's motion for summary judgment.   Dkts. #77 and #78. Concurrently, Plaintiff filed a declaration in support of his opposition to Defendant's motion for summary judgment and a motion to proceed pro se.  Dkts. #79 and #80.  The motions have all been fully briefed and are ripe for the Court's consideration.  Having considered the motions and despite Plaintiff's pending discovery motion, the Court dismisses the action.

ORDER – 1

## II.     BACKGROUND

### A. Factual Background[1]

This is an employment discrimination action. Plaintiff[2] Renardo Robertson, a black man and a veteran, began working for Defendant Catholic Community Services of Western Washington on January 28, 2013. Dkt. #70-1 at 80–91.[3] Plaintiff was initially employed as a Case Manager I in Catholic Community Services of Western Washington Northwest's ("CCSWW NW") Snohomish County Supportive Services for Veteran Families ("SSVF") program, a program that is funded by grants from the Veterans Administration. *Id.* at 24, 90–91. As a SSVF case manager, Plaintiff provided "supportive services for veterans' families and housing services for veterans that are literally homeless or at risk of being homeless" and referred them to "services and resources and help[ed] them access veteran benefits through the Veterans Administration." *Id.* at 27.

Defendant's operations in Western Washington are divided into separately managed agencies covering one or several counties. These agencies operate under different management structures and provide varied programs to address the needs of their communities and clients. For instance, CCSWW NW operated in Whatcom, Skagit, and Snohomish counties. Dkt. #71 at

---

[1] Because of Defendant's pending summary judgment motion, the Court sets forth the factual background in the light most favorable to Plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004). In light of this well-known standard, the factual background set forth in Defendant's motion for summary judgment, which stretches the record to its breaking point, is unfortunately slanted.

[2] Both Renardo Robertson and Donna Robertson, his wife, are named as plaintiffs in this action. However, Ms. Robertson appears to have been included merely to account for any issues related to the Robertsons' marital community. The Court therefore uses the singular in this order.

[3] Throughout, the Court cites to the docket and page numbers applied by the Court's CM/ECF system. Where appropriate, the Court cites to numbered paragraphs or page and line numbers.

ORDER – 2

¶ 2.   At times relevant to this action, William Rice was CCSWW NW's Vice President and Agency Director and Cindy Price was its Human Resource Manager.  *Id.*; Dkt. #72 at ¶ 2.

Defendant's Snohomish SSVF program was relatively small.  The staff consisted of two case managers overseen by one supervisor.  At the relevant times, Plaintiff and Rhonda Polly were the SSVF case managers, Kelli Jo Hurley was their supervisor, and Ms. Hurley was overseen by CCSWW NW's Housing Director, Sarah Jayne Barrett and Ms. Barrett's Associate Housing Director, Rita Jo Case.  Dkt. #73 at ¶ 2; Dkt. #71 at 68; Dkt. #79-1 at 47.

Plaintiff worked hard to make sure that Defendant's Snohomish County SSVF program was a success and, after gaining experience, was elevated to a Case Manager II position in May 2015.[4]  Dkt. #70-1 at 92–93.  Plaintiff continued working to improve the SSVF program and at times disagreed with his supervisors' visions for the path forward.  However, Plaintiff always advocated for what he felt was best for his clients.

Plaintiff's employment was governed by a collective bargaining agreement ("CBA") that provided for additional pay increases for "leads" and employees assuming "additional responsibilities."  Dkt. #71 at ¶ 9; Dkt. #70-1 at 199, 244.  In 2016 and 2017, Plaintiff inquired as to the possibility of being designated a lead under the CBA which would result in a one dollar increase in his hourly wage.  Dkt. #70-1 at 33–34, 199, 244.  However, CCSWW NW's informal policy precluded Plaintiff from becoming a lead because there were only two case managers in the Snohomish County SSVF, and Defendant generally required at least three employees to designate a lead.  *Id.* at 29, 33–34; Dkt. #71 at ¶ 10.  The parties worked to identify appropriate

---

[4] The record appears to indicate that Plaintiff's promotion would have been precluded because he lacked a Bachelor of Arts degree as was originally required for a Case Manager II position. Dkt. #70-1 at 90–91.  However, Defendant modified the job qualifications for the Case Manager II position to recognize the value of Plaintiff's military service and experience and to allow those experiences to substitute for the degree requirement.  *Id.* at 92–93.

1   supervisory positions for Plaintiff in different programs, but Plaintiff did not apply for any open

2   lead or supervisory positions outside of SSVF.  Dkt. #70-1 at 15–16.  On February 26, 2018,

3   Plaintiff was instead assigned "additional responsibilities," entitling him to "3% premium pay"

4   under the CBA.  Dkt. #79 at 11; Dkt. #70-1 at 35, 104, 199, 244.

5   The other SSVF case manager, Ms. Polly, was hired as a Case Manager I in October 2017.

6   She lacked experience working with veterans directly and lacked experience with housing

7   programs generally.  Though Plaintiff was not Ms. Polly's supervisor, inadequate training forced

8   him to train her on most all aspects of her job.  This significant undertaking was in addition to

9   Plaintiff's already complex and heavy caseload.  Dkt. #70-1 at 38.  Even after Plaintiff took on

10  "additional responsibilities," further consuming his time, Ms. Hurley continued to assign him

11  more complex cases than were assigned Mr. Polly.  Dkt. #76 at 8.  In fact, Ms. Polly's caseload

12  was so manageable that she had time to pursue non-work interests during her working hours.

13  Dkt. #79 at 12–15.

14  During his employment, Plaintiff also served as a union representative under the CBA.

15  In June 2018, and after witnessing "several minorities treated differently in the workplace by

16  [Ms.] Price and [Ms.] Barrett," Plaintiff submitted a union grievance (the "June Grievance").

17  Dkt. #71 at ¶ 11; Dkt. #79 at 15.  The June Grievance formally related to "[t]he appearance or

18  reality of workplace discrimination/poor equal opportunity and unfair employment practices

19  stemming from requesting promotions of positions, $1,000 bonuses being issued, training

20  offered, job assignments, disciplinary action taken at the end of formal administrative meetings."

21  Dkt. #71 at 26.  The topic of job assignments related, at least in part, to Ms. Hurley continuing

22  to assign Plaintiff more complex cases even as he took on additional responsibilities and was

23  forced to train Ms. Polly.

24  //

ORDER – 4

1    In September 2018, and despite the continuing need for Plaintiff to train Ms. Polly and

2    work closely with her—as she was the only other SSVF case manager—, Defendant relocated

3    Plaintiff and Ms. Polly from their shared office.  Plaintiff was moved to a less desirable office of

4    his own while Ms. Polly was placed in a different shared office with a non-SSVF employee.  Dkt.

5    #79 at 16.  Plaintiff believed that the office changes impaired SSVF's ability to serve its clients

6    and believed that it was "retaliation for [his] reporting what is clearly racial bias and waste, fraud

7    and abuse" in his June Grievance.  Dkt. #71 at 46.

8    After the move, on September 17, 2018, Plaintiff filed another grievance more formally

9    addressing his complaints about the office changes (the "September Grievance") and maintained

10   that he and Ms. Polly should have been moved to a new two-person office.  *Id.*  Plaintiff requested

11   that the September Grievance be considered with the June Grievance.  *Id.* at 43.  After a grievance

12   hearing, Defendant responded to Plaintiff's grievances on October 31, 2018, finding the

13   allegations of CBA violations unsupported.  Dkt. #72 at 7–9.  Plaintiff sought to appeal the

14   grievance further but ultimately withdrew the grievances on March 18, 2019.[5]  Dkt. #79-2 at 53.

15   Meanwhile, Plaintiff's coworker, Ms. Polly, resigned from her SSVF position in "Spring

16   2019."  Dkt. #71 at ¶ 17; Dkt. #72 at ¶ 9 (indicating resignation in "Feb 2019").  Defendant posted

17   the SSVF Case Manager position and proceeded to find a qualified applicant.  Dkt. #71 at 91.

18   However, Defendant did not ultimately hire the replacement, an error that Plaintiff believed

19   betrayed the SSVF program and its clients and an opinion that he shared with Ms. Price.  Dkt.

20   #76-1 at 67–68; Dkt. #79 at 9–10.  Overworked and isolated, Plaintiff was unable to satisfy his

---

[5] Plaintiff had filed a charge with the Washington State Human Rights Commission as early as June 3, 2018.  Dkt. #71 at 67.  After Defendant's October 31, 2018 Response, Plaintiff amended his charge to include the office changes as an instance of retaliation.  *Id.* at 68.  Plaintiff in turn withdrew the Washington State Human Rights Commission charges prior to filing this action. *Id.* at 70; Dkt. #76-1 at 61.

ORDER – 5

core duties and his "additional responsibilities" and was forced to resign from his additional responsibilities beginning May 1, 2019. Dkt. #71 at 51.

Plaintiff's work environment continued to deteriorate. Ms. Hurly, Plaintiff's supervisor, "made critical comments toward" him, "accused him of completing a form incorrectly," and used "extremely condescending" and "aggressive and authoritative" language towards him in front of staff from another region. *Id.* at ¶ 19; *id.* at 53–54. On May 23, 2019, Plaintiff was forced to file another grievance related to his work environment (the "May Grievance"). *Id.* at 53–54. Ms. Hurley resigned from CCSWW NW shortly thereafter and Defendant did not respond to the May Grievance. *Id.* at ¶ 19; *id.* at 53. After Defendant did not respond to the grievance,[6] Plaintiff was forced to file a formal Charge of Discrimination with the Washington State Human Rights Commission on June 25, 2019. Dkt. #70-1 at 149–52.

On July 1, 2019, Plaintiff was informed that Defendant had "made the agency decision to not pursue a renewal for Snohomish County in the upcoming CCSWW RFP for SSVF services." *Id.* at 122. Defendant indicated to Plaintiff that Snohomish County was "very near to functional zero in Veteran's homelessness." *Id.* Plaintiff was informed that he would be provided a layoff notice and that Defendant would "explore his options with other housing programs in NW." *Id.* This decision was made even though the SSVF program was already fully funded from October 1, 2019, through September 30, 2020.[7] Dkt. #79-2 at 64–93. On July 3, 2019, Plaintiff was provided a formal layoff notice that would become effective September 30,

---

[6] A delay that Plaintiff likewise believed was on account of his race. Dkt. #71 at 56.

[7] Defendant was permitted to divert the funds to different SSVF programs in Western Washington, to the detriment of Snohomish County veterans. Dkt. #79 at 21; Dkt. #69 at 15–16.

2019. Dkt. #71 at 64. Plaintiff was placed into a reemployment pool where he would appreciate preferential consideration but did not apply for any open positions.[8]

Even after Plaintiff formally entered his May Grievance, Defendant did not take it seriously and dragged its feet in addressing the allegations. Ultimately, because of the delays, Plaintiff could only conclude that Defendant did not plan to address his concerns. On July 30, 2019, Plaintiff withdrew the grievance. *Id.* at 61.

**B. Procedural Facts**

This case suffered a tortured history. The parties have struggled to resolve disputes without the Court's intervention. Defendant has filed two motions to compel discovery, both of which the Court has granted in part and denied in part. *See* Dkts. #28 and #39. Even so, discovery disputes persist. Plaintiff has filed a motion to compel discovery responses and Defendant has filed a motion to compel a psychological independent medical examination. Dkts. #57 and #59.

Plaintiff has also experienced difficulty retaining counsel. Plaintiff was originally represented by Ms. Natalie Teravainen. Dkt. #1. However, in July 2020, Ms. Teravainen filed a motion to withdraw as counsel and the parties filed a stipulated motion to continue approaching deadlines. Dkts. #41 and #46. Plaintiff, acting pro se despite being represented by counsel, filed several briefs airing his grievances with Ms. Teravainen even as they bore little relevance to the issues before the Court. Dkts. #42, #43, and #45. Plaintiff also objected to a continuance of the matter at that time. Dkt. #47. Noting the ethical concerns raised by Plaintiff's counsel, the Court granted the motion to withdraw and continued the case deadlines.

Plaintiff was able to retain substitute counsel, with Mr. Rodney R. Moody appearing in this matter on September 29, 2020. Dkt. #52. But issues appear to have arisen between Plaintiff

---

[8] Plaintiff argues that he did not apply for two positions identified by Defendant because he did not meet the minimum qualifications specified for the positions. Dkt. #76 at 5.

ORDER – 7

and his current counsel as well, fueled in part by a misunderstanding regarding the opportunity of a settlement conference before the Honorable Michelle L. Peterson, United States Magistrate Judge. Due to the dispute, Plaintiff's counsel submitted a response to Defendant's motion for summary judgment and Plaintiff directly filed his declaration in opposition to the motion for summary judgment. Dkts. #76 at #80. Due to the ongoing disputes, Mr. Moody then filed a motion to withdraw as counsel and requested that the Court delay consideration of Defendant's motion for summary judgment. Dkts. #77 and #78.

### III.   DISCUSSION

#### A. Plaintiff's Motion to Compel Discovery

The Court begins with Plaintiff's Motion to Compel Discovery both because it was filed first and because the motion to compel discovery responses has the potential to impact Plaintiff's ability to respond to Defendant's subsequently filed motion for summary judgment. Specifically, Plaintiff's motion seeks an order compelling Defendant "to fully answer interrogatory questions and produce documents in response to" Plaintiff's earlier discovery requests. Dkt. #57 at 1. Accordingly, the Court considers the merits of Plaintiff's motion to compel.

#### 1. Background

Plaintiff, in December 2019, and while still represented by Ms. Teravainen, served 22 interrogatories and 34 requests for production on Defendant. Dkt. #57-1 at 6–41. Defendant duly responded to Plaintiff's discovery requests in January 2020 and asserted that at least 14 of the interrogatories contained distinct subparts that had to be individually counted against the 25 interrogatories allowed under the Federal Rules of Civil Procedure. *Id.* at 6–41; *see also* FED. R. CIV. P. 33(a)(1). Applying its objections, Defendant responded to the first 25 interrogatories and discrete subparts and produced 915 pages of records. Dkt. #62 at ¶ 2. In July 2020, Plaintiff served Defendant a letter taking issue with Defendant's discovery responses. This led Defendant

ORDER – 8

1   to produce more than 1,000 pages of additional records in August 2020. *Id.* at ¶ 4. Each

2   production from Defendant invited further conferencing to address any disputes.

3          After Mr. Moody appeared in this action, and almost six months since Defendant served

4   discovery responses, Plaintiff raised concerns about Defendant's discovery responses.   On

5   February 10, 2021, just five days before the deadline for motions related to discovery, Plaintiff

6   requested that Defendant alter its responses to Plaintiff's interrogatories and requests for

7   production and meet and confer. Dkt. #57-1 at 43–45. The parties conferred and the next day,

8   February 12, 2021, Defendant produced an additional 34 pages of documents. Dkt. #62 at ¶ 9.

9   Shortly thereafter, Plaintiff filed his motion to compel, seeking an order compelling Defendant

10  "to fully answer interrogatory questions and produce documents" responsive to Plaintiff's

11  discovery requests. Dkt. #57 at 1.

12         **2.  Legal Standard**

13         Federal Rule of Civil Procedure 26 sets the broad scope of permissible discovery:

14         Unless otherwise limited by court order, the scope of discovery is as follows:
        Parties may obtain discovery regarding any nonprivileged matter that is relevant
15         to any party's claim or defense and proportional to the needs of the case,
        considering the importance of the issues at stake in the action, the amount in
16         controversy, the parties' relative access to relevant information, the parties'
        resources, the importance of the discovery in resolving the issues, and whether
17         the burden or expense of the proposed discovery outweighs its likely benefit.
        Information within this scope of discovery need not be admissible in evidence to
18         be discoverable.

19  FED. R. CIV. P. 26(b)(1).  After the 2015 amendments to Rule 26, "[t]he parties and the court

20  have a collective responsibility to consider the proportionality of all discovery and consider it in

21  resolving discovery disputes." FED. R. CIV. P. 26, Advis. Comm. Notes for 2015 Amends.  Even

22  where evidence is relevant and proportional, the Court may limit discovery where "the discovery

23  sought is unreasonably cumulative or duplicative, or can be obtained from some other source that

24  is more convenient, less burdensome, or less expensive." FED. R. CIV. P. 26(b)(2)(C)(i).  If

1  requested discovery is not answered, the requesting party may move for an order compelling such

2  discovery.  FED. R. CIV. P. 37(a)(1).  This Court's local rules require that "[a]ny motion for an

3  order compelling disclosure or discovery must include a certification . . . that the movant has in

4  good faith conferred or attempted to confer with the person or party failing to make disclosure or

5  discovery in an effort to resolve the dispute without court action."  LOCAL RULES W.D. WASH.

6  LCR 37(a)(1).

7      **3.  Discussion**

8          Plaintiff's motion to compel lacks legal support.  The Court initially notes that Plaintiff

9  provides no legal authority supporting his position.  *See* Dkt. #57-1 at 43–45 (Plaintiff's counsel's

10  Feb. 10, 2021 letter to Defendant's counsel containing no citations to legal authority); Dkt. #57

11  (Plaintiff's motion containing only general citations to the Federal Rules of Civil Procedure);

12  Dkt. #65 (Plaintiff's reply lacking citations to legal authority).

13          Plaintiff's motion is ill-conceived.  Plaintiff does not take issue with any specific

14  objections contained in Defendant's responses to Plaintiff's interrogatories and requests for

15  production.  Rather, Plaintiff offers to "strike" numerous interrogatories and subparts of

16  interrogatories and have Defendant provide more complete answers to fewer than 25

17  interrogatories and discrete subparts.  Dkt. #57-1 at 43.  Similarly, Plaintiff offers not to seek

18  additional documents for certain requests for production "in exchange" for Defendant

19  supplementing its production of responsive records on other requests for production.  *Id.* at 44.

20  But Plaintiff does not establish or explain why Defendant should be forced to accept his

21  compromise or what benefit Defendant gains by Plaintiff now striking interrogatories that

22  Defendant has already responded to under penalty of perjury.

23          Plaintiff also filed this motion in violation of the local rules.  This Court's local rules

24  require a certificate that "the movant has in good faith conferred . . . with the person or party

ORDER – 10

failing to make disclosure or discovery in an effort to resolve the dispute without court action." LOCAL RULES W.D. WASH. LCR 37(a)(1). Plaintiff did not include such a certification in or with his motion.

Plaintiff's meet and confer lacked good faith. Plaintiff had Defendant's initial discovery responses for more than a year. Only several days before the Court's deadline for filing discovery related motions, Plaintiff finally raised his concerns with Defendant's counsel. *C.f. Herndon v. City of Henderson*, ___ F. Supp. 3d ___, Case No. 19-cv-18-GMN-NJK, 2020 WL 7382766, at *5 (D. Nev. Dec. 16, 2020) ("One would generally expect that a motion to compel should be filed within a matter of weeks, not half a year after service of the underlying discovery responses.") (citations omitted). When Plaintiff finally raised his concerns, they were vague and lacked legal support. Plaintiff's position appears less of a legal argument and more of a negotiating position. Plaintiff's motion does not identify true legal disputes for the Court. Rather, and after Plaintiff waited until the waning days of discovery, Plaintiff sought to alter his initial discovery requests to shore up his faltering case. Plaintiff's failure to identify the discovery believed to have been improperly withheld[9] presented the parties with little to no opportunity to resolve the dispute without the involvement of the Court.[10]

---

[9] Of note, even where Defendant objected to interrogatories or subparts on the basis that they exceeded the 25 allowed under the rules, Defendant sometimes provided limited answers. *See e.g.* Dkt. #57-1 at 19, 21 (Defendant providing limited substantive responses to interrogatories 15 and 19). Similarly, even where Defendant made specific objections to Plaintiff's requests for production, Defendant otherwise provided responsive documents. *See e.g. id.* at 30–31 (Defendant raising objections to the request for production and identifying responsive documents otherwise produced).

[10] At least 16 times in its January 2020 responses, Defendant requested a discovery conference with Plaintiff's prior counsel to address its objections. Dkt. #57-1 at 5–41. Defendant further requested another discovery conference with Plaintiff's prior counsel on August 24, 2020. Dkt. #62 at 47. Plaintiff's current counsel's first attempt to discuss discovery disputes with Defendant's counsel appears to have been a January 28, 2021 letter. *Id.* at 49–50.

ORDER – 11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Lastly, Plaintiff's motion is not accurate, failing to fully reflect the history of the discovery dispute.  Plaintiff's motion misleadingly gives the impression that Defendant has not provided any responses to Plaintiff's discovery requests.  *See, e.g.,* Dkt. #57 at 2 (Defendant's final response "provided substantive answers to request for production 15.  No other documents have been provided.").  But Defendant indicates that it served responses and 915 pages of records and that it subsequently supplemented its production with more than 1,000 additional pages in August 2020.  Dkt. #62 at ¶¶ 2, 4.  Following the parties' February 11, 2021 conference, Defendant produced 34 more pages of documents, unmentioned in Plaintiff's motion.  *Id.* at ¶ 9.

The record before the Court is not one upon which to question Defendant's compliance with its discovery obligations.  Plaintiff, after sitting on discovery responses for almost six months, provided Defendant several days to agree to Plaintiff's preferred resolution of an issue Plaintiff alone created by setting forth more than 25 interrogatories and discrete subparts.  Rather, the Court is left with the firm impression that Plaintiff seeks to proceed with a fishing expedition in the hopes that some helpful evidence will be discovered.  This is not in line with Rule 26's direction that discovery be "proportional to the needs of the case" and the Court will not delay ruling on Defendant's motion for summary judgment to assuage Plaintiff's hope for the discovery of new and helpful evidence.

**B.  Defendant's Motion for Summary Judgment[11]**

The Court next addresses Defendant's motion for summary judgment seeking dismissal of Plaintiff's claims and rulings in its favor as to whether punitive damages are available to Plaintiff and whether Plaintiff's damages are limited by Defendant's discovery of "after acquired

---

[11] Defendant requested oral argument on its motion for summary judgment.  The Court finds oral argument unnecessary to its resolution of this matter and denies the request.  Local Rules W.D. Wash. LCR 7(b)(4) ("Unless otherwise ordered by the court, all motions will be decided by the court without oral argument.").

ORDER – 12

1    evidence" justifying Plaintiff's termination.  *See generally* Dkt. #69.  Plaintiff opposes the motion

2    on all bases.  *See generally* Dkt. #76.

3    ### 1.  Legal Standard

4            Summary judgment is appropriate where "the movant shows that there is no genuine

5    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED.

6    R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Material facts are

7    those which might affect the outcome of the suit under governing law.  *Anderson*, 477 U.S. at

8    248.  In ruling on summary judgment, a court does not weigh evidence to determine the truth of

9    the matter, but "only determine[s] whether there is a genuine issue for trial."  *Crane v. Conoco,*

10   *Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*,

11   969 F.2d 744, 747 (9th Cir. 1992)).

12           The non-moving party must present significant and probative evidence to support its

13   claim or defense.  *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir.

14   1991).  "The mere existence of a scintilla of evidence in support of the [non-moving party's]

15   position will be insufficient; there must be evidence on which the jury could reasonably find for

16   the [non-moving party]."  *Anderson*, 477 U.S. at 251.  Neither will uncorroborated allegations

17   and self-serving testimony create a genuine issue of material fact.  *Villiarimo v. Aloha Island Air,*

18   *Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809

19   F. 2d 626, 630 (9th Cir. 1987).  Rather, the non-moving party must make a "sufficient showing

20   on [each] essential element of her case with respect to which she has the burden of proof" to

21   survive summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

22           On summary judgment, the Court views the evidence and draws inferences in the light

23   most favorable to the non-moving party.  *Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of*

24   *the Navy*, 365 F.3d 827, 832 (9th Cir. 2004).  However, where the non-moving party fails to

properly support an assertion of fact or fails to properly address the moving party's assertions of fact, the Court will accept the fact as undisputed. FED. R. CIV. P. 56(e).  As such, the Court relies "on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1278–79 (9th Cir. 1996) (quotation marks and citations omitted).  The Court need not "comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001); *Keenan*, 91 F.3d at 1279 (the court will not "scour the record in search of a genuine issue of triable fact").

### 2.  Plaintiff's Discrimination Claims

Because there will rarely be direct evidence of discrimination, discrimination claims are often considered under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792 (1973).  *See Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate,* 470 F.3d 827, 837–38 (9th Cir. 2006) (affirming that Title VII substantive standards apply to a § 1981 claim); *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cnty.*, 189 Wash.2d 516, 404 P.3d 464, 470–71 (2017) (applying *McDonnell Douglas* framework to claims under the WLAD).  Because Washington Courts look to federal law in interpreting the WLAD, *see id.*, the Court will consider this motion under federal law, considering Washington case law where appropriate.

Under *McDonnell Douglas*, a plaintiff bears the initial burden of establishing a prima facie case by raising an inference of discrimination—a "presumption that the employer unlawfully discriminated against the employee." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981).  After this prima facie case is made, the burden "then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (quoting *Lowe v. City of Monrovia*, 775 F.2d 998, 1005 (9th Cir. 1985), *as amended*, 784 F.2d 1407 (1986)).  If the defendant

ORDER – 14

1    succeeds, then to defeat summary judgment, the plaintiff must demonstrate that the "articulated

2    reason is a pretext for unlawful discrimination by 'either directly persuading the court that a

3    discriminatory reason more likely motivated the employer or indirectly by showing that the

4    employer's proffered explanation is unworthy of credence.'"  *Aragon v. Republic Silver State*

5    *Disposal, Ind.*, 292 F.3d 654, 658–59 (quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115,

6    1124 (9th Cir. 2000) (quotation marks and string citation omitted)).  "Although intermediate

7    burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier

8    of fact that the defendant intentionally discriminated against the plaintiff remains at all times with

9    the plaintiff.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting

10    *Burdine*, 450 U.S. at 253).

11    **a.  Plaintiff's Prima Facie Case**

12    An inference of discrimination may be established "in whatever manner is appropriate in

13    the particular circumstances."  *Diaz v. Am. Telephone & Telegraph*, 752 F.2d 1356, 1361 (9th

14    Cir. 1985).  "The requisite degree of proof necessary to establish a prima facie case for [§ 1981]

15    claims on summary judgment is minimal and does not even need to rise to the level of a

16    preponderance of the evidence."  *Wallis*, 26 F.3d at 889 (citing *Yartzoff v. Thomas,* 809 F.2d

17    1371, 1375 (9th Cir. 1987), *cert. denied,* 498 U.S. 939 (1990)).  In disparate treatment cases, the

18    inference is often established by the plaintiff showing that: (1) he is a member of a protected

19    class, (2) he was qualified for his position, (3) he was subject to an adverse employment action,

20    and (4) similarly situated employees outside the protected class were treated more favorably.

21    *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).

22    Noting that Plaintiff's burden is minimal at the prima facie stage, the Court finds that

23    Plaintiff has established a prima facie case.  *See Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151,

24

ORDER – 15

1158 (9th Cir. 2010).  First, the parties agree that Plaintiff is a member of a protected class on

account of his race[12] and that he was qualified for his position.

### i.  Adverse Employment Actions

The parties dispute whether Plaintiff was subject to an adverse employment action.

Plaintiff points, variously, to the refusal to designate him as a lead, to his more complex

workload, to his change in offices, to his general mistreatment by Ms. Hurley, and to his final

termination.[13]  Dkt. #76 at 4–8.  Defendant argues that Plaintiff's termination was not an adverse

employment action because the termination was brought about because Plaintiff refused to apply

for Defendant's open positions.  Dkt. #81 at 3–4.  As to Plaintiff's remaining complaints,

Defendant argues that the actions were too trivial to constitute adverse employment actions.  Dkt.

#69 at 20–23.

The Ninth Circuit takes an expansive view on what constitutes an adverse employment

action.  *Ray v. Henderson*, 217 F.3d 1234, 1240, 1241 (9th Cir. 2000).  Adverse employment

actions include "termination, dissemination of a negative employment reference, issuance of an

undeserved negative performance review and refusal to consider for promotion."  *Brooks v. City

of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).  However, in order to be adverse, "a change in

employment conditions" must be "more than an inconvenience or alteration of one's job

responsibilities."  *Alonso v. Quest Comms. Co., LLC*, 178 Wash. App. 734, 746, 315 P.3d 610,

---

[12] Defendant asserts, and Plaintiff does not challenge, that Plaintiff's deposition testimony specifically disclaimed any discrimination on the basis of Plaintiff's veteran status.  Dkt. #69 at 18 (citing Dkt. #70-1 at 46–47 (ln. 146:20-147:1)).

[13] Defendant splits Plaintiff's termination into (1) issuance of a layoff notice, (2) refusal to rescind the layoff notice, and (3) terminating Plaintiff's employment.  *Id.*  The Court considers these actions in combination as effecting Plaintiff's termination of employment.

ORDER – 16

617 (2013) (citation omitted); *see also Kirby . City of Tacoma*, 124 Wash. App. 454, 465, 98 P.3d 827 (2004) (same).

For purposes of this motion, the Court is satisfied that Plaintiff has established that he was subjected to adverse employment actions sufficient to support a prima facie case of discrimination. Refusing to promote Plaintiff while forcing him to act as a supervisor, assigning him more complex work than his coworker, and placing him in a less desirable office are all sufficiently adverse.

The Court is not persuaded by Defendant's argument that it was not responsible for Plaintiff's termination because Plaintiff did not apply for other positions with Defendant after being notified that he would be laid off. Dkt. #69 at 22. First, Defendant does not cite to authority supporting its theory.[14] Second, the stark reality is that Defendant employed Plaintiff as of September 30, 2019, and no longer employed him after that date. At minimum, Plaintiff created genuine disputes material to whether he was subjected to adverse employment actions.

### ii. Disparate Treatment and Racial Animus

Plaintiff experiences more difficulty demonstrating that other employees were treated more favorably. In most regards, Plaintiff does not establish that he is similarly situated to other "comparators." At the time Plaintiff was terminated, he was the only Snohomish County SSVF case manager and Ms. Polly was not terminated, she resigned. Similarly, Plaintiff cannot point to other CCSWW NW employees that were designated leads over fewer than three employees. And as to Plaintiff's workload relative to Ms. Polly's, Plaintiff was a Case Manager II and had agreed to take on "additional responsibilities."

---

[14] At best, Defendant establishes that in certain situations, a lateral transfer may not be an adverse employment action. Dkt. #69 at 22 (citing *Donahue v. Cent. Wash. Univ.*, 140 Wash. App. 17, 26, 163 P.3d 801, 806 (2007); *Tyner v. Dep't of Soc. and Health Servs.*, 137 Wash. App. 545, 564–65, 154 P.3d 920, 929 (2007)).

ORDER – 17

But Plaintiff at least establishes a genuine dispute as to whether he was treated less favorably in Defendant's reassignment of office space and his termination. Plaintiff establishes both that his office, at least to him, was less desirable and that it negatively impacted his ability to perform his job. Dkt. #70-1 at 41, 44–46. Similarly, Plaintiff establishes that Kathy Batrack, a Caucasian employee holding a position equivalent to Plaintiff's, was transferred to a new position instead of being laid off. *Id.* at 77–78. Due to Plaintiff's minimal burden at the prima facie stage, the Court proceeds to consider Defendant's proffered business reasons for the adverse actions taken against Plaintiff.

### b. Defendant Had Legitimate Business Reasons for Its Actions

Rebutting the inference that Plaintiff faced racial discrimination, Defendant presents sufficient evidence establishing that it had legitimate business reasons for the actions it took.

As to Plaintiff's desire to be designated a lead or assigned additional duties in 2016 and 2017, Defendant establishes that there was no policy requiring it to designate a lead and that "[a]s a practice, [Defendant does] not designate a Lead for teams with fewer than three (3) team members." Dkt. #71 at ¶ 10. Instead, Defendant assigned Plaintiff additional duties and paid him additional compensation. *Id.*; Dkt. #79 at 11.

As to the assignment of work between Plaintiff and Ms. Polly in May 2018, the record establishes that Ms. Polly was a less experienced case manager that held a lower position and that Plaintiff had agreed to be assigned additional responsibilities. Dkt. #71 at ¶ 11. Further, Defendant introduces testimony that Plaintiff's supervisor offered to assign some of his cases to Ms. Polly to alleviate his workload, but that Plaintiff declined. Dkt. #69 at 24–25; Dkt. #70-1 at 38, 80–82; Dkt. #71 at ¶ 11. Plaintiff does not present countervailing evidence.

As to the office change, Defendant indicates that the change was made at the behest of Ms. Polly after she complained that Plaintiff was micro-managing her and "acting like her

supervisor, even though he had been told before that he was not her supervisor." Dkt. #73 at ¶ 7; Dkt. #71 at ¶ 13. Ms. Polly requested to be relocated. Both were relocated, Ms. Polly to a shared office and Plaintiff, because of his seniority, to a solo office. *Id.* at ¶ 14. When Plaintiff subsequently objected to his office, he was offered other offices, all of which he rejected. *Id.* at ¶ 16; Dkt. #79-2 at 40–41.

As to Plaintiff's termination, Defendant establishes that since 2017 it had been refocusing its efforts on its new "72-unit permanent housing facility known as Clare's Place." Dkt. #69 at 13; Dkt. #72 at ¶ 6. As part of this process, Defendant terminated four other programs in addition to SSVF. Dkt. #72 at ¶ 9. Further, Defendant presents evidence that the need for veteran housing services was decreasing within Snohomish County and presents a document, purportedly from Snohomish County, indicating that Snohomish County had reached its "goal of ending veteran homelessness on June 1, 2018." Dkt. #72 at 26.

These legitimate business reasons effectively rebut the presumption of discrimination raised by Plaintiff's prima facie case, leaving it for Plaintiff to demonstrate that the purported business reasons are merely pretext for intentional discrimination on account of Plaintiff's race.

### c.  Defendant's Reasons Are Not a Pretext for Unlawful Discrimination

Pretext can be established by showing "that a discriminatory reason more likely motivated the employer" or "that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. A plaintiff may rely on direct evidence which proves discriminatory animus on its own—typically clearly discriminatory statements or actions—or circumstantial evidence which "requires an additional inferential step to demonstrate discrimination." *Coghlan v. American Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005). "'[V]ery little' direct evidence of [a] discriminatory motive is sufficient." *Winarto v. Toshiba America Elecs. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001). But where circumstantial evidence is

1  used, "a plaintiff must put forward specific and substantial evidence challenging the credibility

2  of the employer's motives." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003)

3  (citations omitted).

4          Plaintiff presents no evidence of direct racial discrimination in the workplace.  At best,

5  Plaintiff objects that Ms. Barrett displayed a "Black Lives Matter" sign that Plaintiff found

6  objectionable: "Plaintiff and other minorities believed that it was hypocritical of [Ms.] Barrett to

7  post the sign while terminating or forcing minorities to resign."  Dkt. #79 at 16.  Putting aside

8  the vague and conclusory nature of Plaintiff's testimony, posting of a Black Lives Matter sign—

9  generally interpreted as supporting the fight against systemic racism—does not support an

10 inference of racial animus.  Without more, Plaintiff's subjective interpretation is not indicative

11 of Ms. Barrett's intent.  And further still, Ms. Barrett testifies that she did not participate in the

12 decisions to relocate Plaintiff's office, to terminate Plaintiff's employment, or to discontinue the

13 SSVF program.  Dkt. #73 at ¶¶ 5–6.  Plaintiff is left to establish pretext on the basis of

14 circumstantial evidence.

15         Plaintiff first attempts to demonstrate that Ms. Polly and Mr. Joshua Johnson were

16 similarly situated comparators that were treated disparately, but neither are similarly situated.  As

17 was previously noted, Ms. Polly cannot serve as a similarly situated comparator as to Plaintiff's

18 workload because she was an inexperienced Case Manager I.[15]  Even if she was similarly situated

19 to Plaintiff with regard to designation as a lead, she was not treated more favorably than Plaintiff

20 as she was never designated a lead or assigned additional responsibilities.  Lastly, Ms. Polly

21

22  ───────────────────

23 [15] Further, in order to demonstrate a hostile work environment claim, Plaintiff would have to
   demonstrate that his workplace was "permeated with discriminatory intimidation . . . that is
   sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive
24 working environment."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal
   quotation marks and citations omitted).

ORDER – 20

resigned her position prior to Plaintiff's termination and cannot serve as a similarly situated comparator as to Plaintiff's termination.[16]

Mr. Johnson also cannot serve as a similarly situated comparator. Mr. Johnson is a Caucasian employee who was not punished after he violated Defendant's facility access policy. Dkt. #76 at 10. Plaintiff does not demonstrate for what purposes Mr. Johnson should be considered a similarly situated employee with regard to the adverse employment actions at issue in this case. *See Kirby v. City of Tacoma*, 124 Wash. App. 454, 475 n.16 (2004) (noting that disparate treatment considers similarly situated employees, those with the same supervisors and subjected to the same standards, engaging in similar conduct).

Turning next to the relocation of Plaintiff and Ms. Polly to separate offices, the Court does not find evidence of racial discrimination or that Defendant's proffered business reasons are unworthy of credence. In opposition, Plaintiff relies on his subjective belief that his race was the motivating factor behind the office relocations. But Plaintiff's subjective conclusions, not based on any evidence, are insufficient. Defendant presents evidence that Ms. Polly complained of Plaintiff's conduct and requested to be relocated and that Plaintiff was assigned a single office because he held seniority. Plaintiff maintains that Ms. Polly's complaints were a sham because they were never formally investigated. Dkt. #76 at 10. Plaintiff's subjective belief falls short of demonstrating that Defendant's proffered business reason is unworthy of credence.

Plaintiff also does not establish that Defendant's proffered reason for Plaintiff's termination is unworthy of credence. Plaintiff's strongest argument is that the decision to terminate the SSVF program was pretextual as the need to serve homeless veterans in Snohomish

---

[16] The Court separately considers whether Plaintiff's and Ms. Polly's office reassignments are indicative of discriminatory animus below and concludes that they are not.

ORDER – 21

County remained,[17] Defendant was funded to continue providing veterans services through September 2020, and homeless veterans continue to receive services in Snohomish County.  Dkt. #76 at 12; Dkt. #79 at 21.  Plaintiff's evidentiary support is primarily his unsupported speculation, but even that does not conflict with Defendant's evidence that it was considering terminating the SSVF program in advance of Plaintiff's termination or that the services were being integrated into services at Clare's Place.  The premise of the argument, that Plaintiff should have remained employed by Defendant, is further contradicted by Defendant's evidence that it wished to transfer Plaintiff to other positions within the organization but that Defendant did not apply for the positions.[18]  In the end, "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993).  Plaintiff has presented no evidence supporting the conclusion that Defendant's proffered business reasons are unworthy of credence or that he was subjected to unlawful racial discrimination.

//

//

//

---

[17] Plaintiff maintains, without factual support, that "[w]hether Snohomish County was at functional zero [homeless veterans] is also disputed."  Dkt. #76 at 12.  But in the absence of evidence showing that to be the case, Plaintiff does not establish a genuine dispute as to a material fact.

[18] Ms. Price testifies on behalf of Defendant that it "planned to transfer any interested employees from the five discontinued programs (used to help fund Claire's Place) to other open positions, with the same pay and benefits." Dkt. #71 at ¶ 23 ("We wanted to keep Mr. Robertson employed with [Defendant].").  Defendant forwarded notice of two open positions to Plaintiff.  *Id.*  But Plaintiff disputes whether the positions were truly available to him as he did not meet the stated "Minimum Qualifications" set forth in the job postings. Dkt. #76 at 14.  Even if true, this does not alter Defendant's other evidence showing that it wanted to continue employing Plaintiff.

ORDER – 22

### 3. Plaintiff's Retaliation Claims

Retaliation is likewise considered under a burden-shifting framework.  First, "a plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action[19] and (3) a causal link between the two."  *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (citing *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997)).  Following a showing of a prima facie case, the burden "shifts to the employer to present legitimate reasons for the adverse employment action" and a plaintiff must demonstrate that the reason advanced was merely a pretext. *Id.*

Plaintiff's claims again fail because he does not demonstrate causation between his protected activity and the adverse employment actions he complains of.  Plaintiff establishes that, as early as June 2018, he engaged in protected activity by reporting his belief that racial discrimination was occurring within CCSWW.  But Plaintiff offers no facts—beyond the occurrence of the adverse employment actions—as evidence that he was subjected to any retaliation.  That Plaintiff complains of adverse employment actions predating his protected activity[20] cuts against his argument that he was subjected to adverse employment actions as retaliation for engaging in protected activity.  And again, Defendant establishes that Plaintiff was moved from his shared office because of Ms. Polly's complaints and that Plaintiff was terminated because Defendant was ending the SSVF program to focus on Clare's Place.  Plaintiff fails to demonstrate that these business reasons are pretextual.  Plaintiff's reliance on temporal proximity

---

[19] Actionable adverse employment actions for the purpose of retaliation claims include "only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations."  *Brooks*, 229 F.3d at 928 (citing *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000) ("[A]n action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity.")).

[20] Specifically, Plaintiff's complaints that he was not appointed a lead position and that he had to handle a heavier workload both appear to predate Plaintiff's protected activity.

1    is belied by the fact that Defendant terminated other programs at the time it terminated the SSVF

2    program and by Defendant's attempts to move Plaintiff to other open positions.  Even the fact

3    that funding for the SSVF program existed does not challenge the inference that the program was

4    terminated to allocate further resources to Clare's Place.

5           **4.   Plaintiff's Claim for Punitive Damages**

6           Having found that Plaintiff's claims are precluded, the Court does not address whether

7    punitive damages may be available on Plaintiff's discrimination and retaliation claims.

8           **5.   Plaintiff's Public Policy Claim**

9           Plaintiff unsuccessfully argues that his wrongful discharge in violation of public policy

10   claim is not subject to summary judgment.  As set forth by Plaintiff, a tort claim for wrongful

11   discharge in violation of public policy requires a plaintiff "to demonstrate: (1) the existence of a

12   'clear public policy' ('clarity' element), (2) whether 'discouraging the conduct in which the

13   employee engaged jeopardized the public policy' ('jeopardy' element), (3) whether the 'public

14   policy linked conduct caused the discharge' ('causation' element), and (4) whether the employer

15   is 'able to offer an overriding justification for the discharge' ('absence of justification' element)."

16   Dkt. #76 at 16 (citing *Piehl v. City of Federal Way*, 177 Wash.2d 604, 610, 306 P.3d 879 (2013)).

17   For the same reasons identified above, Plaintiff is unable to establish the "causation" element

18   and fails to establish discrimination or termination in violation of public policy.

19          **6.   Plaintiff's Negligent Infliction of Emotional Distress Claim**

20          Defendant contends that Plaintiff's negligent infliction of emotional distress claim is

21   barred because "Plaintiff fails to assert a '*distinct* [injury separate] from the factual basis for the

22   discrimination claim," Dkt. #69 at 29 (quoting *Haubry v. Snow*, 106 Wash. App. 666, 678, 31

23   P.3d 1186 (2002) (emphasis added)), and because terminating Plaintiff's employment was not

24   "unreasonably dangerous," as required for a negligent infliction of emotional distress claim, *id.*

ORDER – 24

(citing *Bishop v. State*, 77 Wash. App. 228, 233–35, 889 P.2d 959, 962–63 (1995)).  Plaintiff

concedes the issue in his opposition, *see* Dkt. #81 at 10, and the Court dismisses the claim.

### 7.  Defendant's After Acquired Evidence Defense

Because the Court grants summary judgment in Defendant's favor it does not address

Defendant's motion for summary judgment on its after-acquired evidence defense limiting

damages.[21]  The Court denies the motion, without prejudice, as moot.

### 8.  Defendant's Motion to Strike

In its reply, Defendant asks that the Court strike Plaintiff's declaration and response brief.

Dkt. #81 at 12.  Defendant primarily complains that Plaintiff does not adequately support his

factual assertions with competent evidence contained in the record.  The Court has considered

Plaintiff's declaration and response, appropriately weighing their reliability.  The Court denies

Defendant's motion to strike.

### 9.  Conclusion

While the Court's admiration and sympathy offer little consolation to Plaintiff, the Court

hopes they may yet find acceptance.  Plaintiff's courageous and dedicated advocacy for himself

and his communities is admirable, and Plaintiff's passion is evident.  The Court's conclusions

should not be taken as indicating that Plaintiff's complaints did not merit consideration and

discussion or that his claims should not have been brought before this Court.  Plaintiff's stalwart

championship of issues important to him tolerated conflict.  While the interactions, in the context

of Plaintiff's life experiences, may have suggested discrimination, Plaintiff lacks evidence

substantiating unlawful discrimination or retaliation.

---

[21] In brief, Defendant establishes that Plaintiff failed to disclose his immediate past employer on his job application, that he was required to submit the information in his job application, and that Defendant would otherwise terminate Plaintiff for his failure to disclose a prior employer.  Dkt. #71 at ¶¶ 7–8.

ORDER – 25

The nation's current introspection on the insidious nature of systemic racism makes this an unsatisfactory result. Our existing laws may not provide sufficient mechanisms for addressing racism's persistent chokehold on our social systems and new laws may be needed. But the Court is not now placed in the position to second guess Defendant's programming and employment decisions.[22] Defendant may act foolishly, even in the face of better options. While Plaintiff perhaps established that Defendant's actions were myopic, hasty, foolish, or ill-considered, Plaintiff does not establish a basis on which to conclude that Defendant's actions were fueled by racial or retaliatory animus.

Unfortunately, Plaintiff's and Defendant's relationship ended contentiously—a feeling that likewise encroached on this action and on counsel's interactions. The Court does not presume to alter Plaintiff's impression of the events and does not doubt that the result feels like yet another slight endured. But the Court is optimistic that all involved can move forward and continue to improve our social functioning through their valuable work for our communities and our country.

**C. Plaintiff's Motion to Continue Consideration of Motion for Summary Judgment**

On April 6, 2021, Plaintiff filed a short motion requesting "a continuance of the Motion for Summary Judgment filed" by Defendant. Dkt. #78. Plaintiff argues that such relief is proper because Defendant's motion for summary judgment was filed after Plaintiff's own motion to compel and that "significant discovery remains unanswered." *Id.* at 2. Plaintiff argues that he has "been compromised in [his] ability to respond to the Motion for Summary Judgment due to

---

[22] *See Villiarimo*, 281 F.3d at 1063 ("[C]ourts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless.") (quotation marks and citations omitted); *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered.") (citation omitted).

ORDER – 26

the failure of Defendant [sic] fully answer discovery requests." *Id.* Further, Plaintiff argues that in light of his counsel's motion to withdraw, he should be permitted to consult with new counsel and perhaps submit revised briefing. *Id.*

Plaintiff's motion is considered under Federal Rule of Civil Procedure 56(d):

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."

FED. R. CIV. P. 56(d). This rule serves as protection against a party's premature motion for summary judgment. As a result, courts grant Rule 56(d) motions "fairly freely" when a party has not had a realistic opportunity to pursue discovery. *Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Rsrv.*, 323 F.3d 767, 773 (9th Cir. 2003) (citations omitted). However, where a party has had a realistic opportunity to conduct discovery, the "party requesting a continuance pursuant to [Rule 56(d)][23] must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006) (citations omitted). "The burden lies with 'the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists' and that it would prevent summary judgment." *Moba v. Total Transp. Servs. Inc.*, 16 F. Supp. 3d 1257, 1262 (W.D. Wash. 2014) (citing *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 921 (9th Cir.1996)).

Plaintiff's motion is not sufficient as it fails to comply with the text of Rule 56(d). That Rule requires a showing, "by affidavit or declaration," of facts essential to justify the non-moving party's opposition. FED. R. CIV. P. 56(d). Plaintiff has not filed an affidavit or declaration. To

---

[23] Prior to the 2010 amendments to the Federal Rules of Civil Procedure the applicable standards were set forth in Rule 56(f).

ORDER – 27

the extent Plaintiff attempts to rely on the declaration of counsel supporting his motion to compel

discovery, the Court has already explained how that declaration wholly fails to identify the facts

sought or that they would preclude summary judgment.  Likewise, Plaintiff's declaration in

opposition to Defendant's motion for summary judgment also does not indicate that he disagrees

with the response filed by his counsel and does not demonstrate that additional relevant factual

material remains to be added to the record.  *See generally* Dkts. #79, #79-1, and #79-2.

Where a motion for a continuance does not "identify the specific facts that further

discovery would have revealed or explain why those facts would have precluded summary

judgment," the motion is appropriately denied.  *Tatum*, 441 F.3d at 1100.  "The mere hope that

further evidence may develop prior to trial is an insufficient basis for a continuance under Rule

56[d]."  *Harris v. City of Seattle*, 315 F. Supp. 2d 1112, 1119 (W.D. Wash. 2004), *aff'd*, 152 F.

App'x 565 (9th Cir. 2005) (quoting *Continental Maritime of San Francisco, Inc. v. Pacific Coast

Metal Trades District Council*, 817 F.2d 1391, 1395 (9th Cir.1987)).  Plaintiff's motion is

denied.[24]

### D.  Defendant's Motion for Independent Medical Examinations

Defendant's Motion for Independent Medical Examination, which appears untimely,[25]

seeks an order compelling Plaintiff to attend a Court-ordered psychological Independent Medical

---

[24] The Court notes that Plaintiff's opposition to Defendant's motion for summary judgment did not seek relief under Rule 56(d) and does not indicate that resolution of Plaintiff's motion to compel will impact the Court's resolution of the motion for summary judgment.  *See* Dkt. #76 (not addressing Plaintiff's pending motion to compel discovery).  Plaintiff does separately request that the Court delay consideration of Defendant's summary judgment motion until it rules on Plaintiff's motion to compel but gives no indication that relevant documents are at issue.

[25] The Court previously set the deadline for motions related to discovery as February 15, 2021.  Dkt. #48.  Defendant's Motion for Independent Medical Examination was filed on February 25, 2021.  Dkt. #59.  Defendant does not address the timeliness of its motion to compel.

Examination ("IME").  Dkt. #59 at 1.  Because the Court dismisses Plaintiff's claims on summary judgment, the Court denies the motion as moot.

**E.  Motion to Withdraw as Counsel and Motion to Proceed Pro Se**

As noted, Plaintiff's counsel has filed a motion to withdraw as counsel of record and Plaintiff has himself filed a motion to proceed pro se.  Dkts. #77 and #80.[26]  Defendant opposes the motions on the basis that Plaintiff has already switched counsel, on the basis that Mr. Moody should already be prepared to take this case to trial, and on the basis of avoiding further delay.  Dkt. #85 at 1–2.  However, there has clearly been a breakdown of the attorney-client relationship and, in light of the Court's dismissal, the Court grants both motions.

## IV.       CONCLUSION

Accordingly, and having considered the motions, the briefing of the parties, materials submitted in support, and the remainder of the record, the Court finds and ORDERS that:

1.  Plaintiff's Motion to Compel Discovery (Dkt. #57) is DENIED.

2.  Defendant's Motion for Independent Medical Examination (Dkt. #59) is DENIED as moot.

3.  Defendant's Motion for Summary Judgment (Dkt. #69) is GRANTED.  The Clerk shall enter judgment in Defendant's favor DISMISSING, with prejudice, all of Plaintiff's claims set forth in his First Amended Complaint for Damages and Further Relief (Dkt. #30).

4.  Counsel Motion for Leave of Court to Withdraw (Dkt. #77) is GRANTED.

5.  Motion to Continue Defense Motion for Summary Judgment (Dkt. #78) is DENIED.

---

[26] Plaintiff's Motion to Proceed Pro Se was received in the Clerk's filing drop box on April 5, 2021, before Plaintiff's attorney filed Counsel Motion for Leave of Court to Withdraw on April 6, 2021.  Dkt. #77.  However, Plaintiff's pro se motion was docketed by the Clerk after the motion to withdraw was docketed by the Court's case management/electronic case filing system.

6.  Plaintiff's Motion to Proceed Pro Se (Dkt. #80) is GRANTED.

7.  This matter is CLOSED

    Dated this 10th day of June, 2021.


                                RICARDO S. MARTINEZ
                                CHIEF UNITED STATES DISTRICT JUDGE

ORDER – 30